**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANGELINA SILVA,

      Plaintiff,

      vs.                                      Civ. No. 19-913 WJ/KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]**

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed December 16, 2019 in support of Plaintiff Angelina Silva's ("Ms. Silva") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying Plaintiff's claims for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI") benefits. On March 16, 2020, Ms. Silva filed her Motion to Reverse and Remand for a Rehearing with Supporting Memorandum. (Doc. 20.) The Commissioner filed a Brief in Response on June 15, 2020 (Doc. 24), and Ms. Silva filed a Reply on June 29, 2020. (Doc. 25.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and being fully advised in the premises, the Court recommends that the Motion to Reverse and Remand for a Rehearing be **GRANTED.**

## I.  Background and Procedural History

---

[1] By an Order of Reference (Doc. 7) entered on October 2, 2019, Chief Judge Johnson referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

This is the third appeal in this case. Ms. Silva is a thirty-eight-year-old woman who lives with her boyfriend and is looked after during the day by her grandmother, Angelina Pedroncelli ("Ms. Pedroncelli"), who raised her. (Administrative Record ("AR") 1005, 1010, 1013-1014, 1050.) She completed school through the eighth grade in special education classes and has attempted, unsuccessfully, to earn her GED six times. (AR 1005-1006.) Her past work includes cashier/clerk at different gas stations, but never for more than four or five months at a time. (AR 1018, 1044.) In 2008, she was fired for falling asleep on the job. (AR 1018.) She last worked in 2010 counting money at a casino. (AR 1016.)

Ms. Silva first filed for DIB and SSI on June 17, 2011 (AR 057-60), alleging a disability onset date of June 1, 2010 due to "[m]ental issues; rheumatoid arthritis; hepatitis b[.]" (AR 061.) After her claims were denied administratively, Ms. Silva appealed to this Court, which reversed the unfavorable decision of administrative law judge ("ALJ") Ann Faris. (*See* AR 591-613; *Silva v. Colvin*, USDC Civ. No. 15-603 SMV.) In Ms. Silva's first appeal, the Court concluded that ALJ Farris "impermissibly rejected" the opinions of consultative psychological examiner John Owen, Ph.D., and State agency consultant Scott Walker, M.D., regarding Ms. Silva's ability to adapt to changes in a routine work setting and "remanded for proper evaluation of the medical opinions of both Dr. Walker and Dr. Owen." (AR 612-13.)

On remand and after considering additional evidence, ALJ Farris again issued an unfavorable decision, from which Ms. Silva appealed. (AR 467-87; *see Silva v. Berryhill*, USDC Civ. No. 17-695 SCY.) In her second appeal, Ms. Silva argued, *inter alia*, that ALJ Farris erred by (1) failing to account for all of the moderate mental limitations assessed by Dr. Owen and Dr. Walker, and (2) improperly rejecting the opinions of Ms. Silva's treating psychiatrist, Susan Danto, M.D. (*Silva*, USDC Civ. No. 17-695 SCY (Doc. 15).) In response to Ms. Silva's motion to reverse

and remand for a rehearing, Commissioner Berryhill filed an unopposed motion to remand in which she indicated that upon further review of Ms. Silva's case, it was "determined that a remand for further proceedings is appropriate." (AR 1067-69.) The Court granted Commissioner Berryhill's motion and remanded the case for further administrative proceedings. (AR 1066.)

While her second appeal was pending, Ms. Silva filed a subsequent application for SSI on July 24, 2017, alleging a disability onset date of February 28, 2017 due to post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and severe tendonitis in both hands. (AR 1050.) After her subsequent application was denied at the initial and reconsideration levels (AR 1050-64, 1077-92), Ms. Silva requested a hearing before an ALJ. (*See* AR 1002.) On November 6, 2018, ALJ Lillian Richter[2] held an administrative hearing—the third in this case—on Ms. Silva's consolidated claims, i.e., those on remand from this Court and Ms. Silva's 2017 SSI claim. (AR 974, 1002, 1003; *see* AR 028-56 (first hearing), AR 493-529 (second hearing), AR 1000-1048 (third hearing).) ALJ Richter issued an unfavorable decision on August 1, 2019 (AR 971-89) from which Ms. Silva now appeals. (Doc. 1.)

## II. <u>Applicable Law</u>

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the

---

[2] In accordance with the Social Security Administration's ("SSA") procedures, Ms. Silva's case was assigned to a different ALJ on remand. (AR 1066, 1068.)

Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B. Disability Benefits and the Sequential Evaluation Process**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of

twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv). If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3). This is called the claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(a)(1) & (a)(3), 416.945(a)(1) & (a)(3). The claimant's RFC is used at step four of the process to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e), 416.920(a)(4)(iv), 416.920(e). If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering his RFC, age,

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Grogan*, 399 F.3d at 1261.

### III.  Discussion

Ms. Silva raises three points of error on appeal: (1) ALJ Richter failed to account for all of the mental limitations found by Dr. Owen and Dr. Walker; (2) ALJ Richter improperly rejected the opinions of Ms. Silva's treating psychiatrist, Susan Danto, M.D., and consultative examiner Steven K. Baum, Ph.D.; and (3) ALJ Richter utilized a vocational conclusion as to jobs Ms. Silva could perform when questioning vocational expert ("VE") Karen Provine at the administrative hearing. (Doc. 20 at 1-2.) The Commissioner argues that ALJ Richter "reasonably considered the opinion testimony and did not err when questioning the VE." (Doc. 24 at 1.)

For the following reasons, the Court agrees with Ms. Silva that the ALJ committed reversible error in handling the medical opinions of record and that remand for a rehearing is required.

### A.  The Law Regarding Consideration and Weighing of Medical Opinions

The Social Security regulations set forth specific standards to be used and factors to be considered in evaluating medical opinions of record. In January 2017, the SSA finalized revisions to its rules regarding the evaluation of medical evidence. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the revised rules, "opinion evidence" for claims filed before March 27, 2017 is evaluated under 20 C.F.R. §§ 404.1527 and 416.927 ("prior rules"), as well as the rulings and caselaw interpreting those rules. For claims filed on or after March 27, 2017, "medical opinions and prior administrative medical findings" are evaluated under 20 C.F.R. §§ 404.1520c and 416.920c ("current rules"). The respective standards for evaluating opinion evidence under the prior and current rules differ.

In relevant part, where the prior rules created an effective hierarchy of opinions based on the source's relationship to the claimant—i.e., a treating source's opinions are generally given more weight than a non-treating source's, and an examining source's opinions are generally given more weight than those of a source who has rendered opinions based on a review of records alone—the current rules expressly do away with the hierarchical treatment of medical opinions. *Compare* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2) (according "more weight" to the opinions of an examining source than a non-examining source and "controlling weight" to a treating source's well-supported opinions that are "not inconsistent with the other substantial evidence" of record), *with* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)").

Additionally, while the factors to be considered in weighing medical opinions are similar under the prior and current rules, *compare* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c), *with* 20 C.F.R. §§ 404.1527(c) and 416.927(c), the prioritization of the factors and requirements for articulating how an adjudicator considered each factor differ. Under the prior rules, the two factors relating to the source's relationship to the claimant—i.e., whether the source has examined or treated the claimant—are given special consideration, while the other four factors—(1) supportability, (2) consistency, (3) specialization, and (4) other factors—must be taken into consideration and discussed by the ALJ only to the extent they are applicable in a given case. *See* 20 C.F.R. §§ 404.1527, 416.927; SSR 06-3p, 2006 WL 2329939, at *5 (Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case."); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (explaining that ALJs are not required to apply expressly each of the six factors but rather must "provide good reasons" for the weight attributed to a medical opinion). By

contrast, the current rules provide that two factors—supportability and consistency—are the "most important factors [the SSA] consider[s]" in determining how persuasive an opinion is and require adjudicators to "explain how [they] considered" those factors.[4] 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2).

In general, adjudicators are required to consider all relevant evidence in the case record in reaching their disability determination. *See* 20 C.F.R. §§ 404.1520b, 416.920b ("After we review *all* of the evidence relevant to your claim, we make findings about what the evidence shows." (emphasis added)). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting her decision but also "the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

### B.  Which Rules Apply in this Case[5]

---

[4] Under the current rules, the ALJ could, but was not required to, explain how she considered the other regulatory factors, comprising relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5), 416.920c(b)(2), (c)(3)-(5).

[5] Although the parties do not address this specific issue in their briefs, both appear to acknowledge that some question exists regarding what law governs Ms. Silva's claims. In her Motion, Ms. Silva relies on the prior rules for evaluating medical opinions and contends that a now-rescinded Social Security Ruling (SSR 96-6p, 1996 WL 374180 (Jul. 2, 1996)) dealing with the evaluation of State agency consultants' administrative findings applies based on her original claims being filed prior to March 27, 2017. (Doc. 20 at 1 n.2, 16-17.) The Commissioner disagrees with Ms. Silva regarding the applicability of SSR 96-6p (Doc. 24 at 11 n.3) but does not dispute that the prior rules apply to evaluating the medical opinions of record. (*See* Doc. 24.) In fact, the Commissioner cites the prior rules numerous times in support of his arguments, never cites the current rules, and acknowledges that "[t]he 2017 revisions apply to this case, except for those rules that state they apply only to applications/claims filed on or after March 27, 2017." (Doc. 24 at 11 n.3

As noted previously, this case involves consolidated claims: one filed well before March 27, 2017, and one filed shortly after. As will be discussed in greater detail below, it also involves medical opinions from six different sources: one of whom is a treating source, two of whom are examining sources, and three of whom are non-examining sources. At the outset, then, there exists a question regarding which rules govern the evaluation of the medical opinions in this case. Properly answering that threshold question is important—indeed, critical—because application of one standard or the other not only had the potential to affect the disability determination in the first instance but also informs the Court's review of the ALJ's decision.

In April 2017, the SSA issued an instruction explaining why it revised its rules regarding the evaluation of medical evidence and how the revised rules are to be implemented, i.e., which rules will apply based on the filing date of the claim.  Social Security Administration Hearings, Appeals and Litigation Law Manual ("HALLEX") I-5-3-30, 2017 WL 1362776, https://www.ssa.gov/OP_Home/hallex/I-05/I-5-3-30.html#i-5-3-30-iv (last updated Jul. 30, 2018). The instruction acknowledges that "[a]djudicators occasionally have to consolidate a subsequent application(s) with a pending application(s) when there are overlapping periods[,]"  such as "when a case is remanded from Federal court and the claimant filed a subsequent application(s)." HALLEX I-5-3-30(IV)(D). It expressly provides that in cases involving consolidated claims where a pending application was filed before March 27, 2017 and a subsequent application was filed on or after March 27, 2017, "adjudicators will apply the prior rules to the consolidated case." *Id.* It then gives the following specific example and commensurate guidance:

> For example, a Federal court remands concurrent claims with filing dates of January 12, 2014. Subsequent concurrent applications with filing dates of March 27, 2017, were denied at the reconsideration level. The [Appeals Council] will remand the

---

(quoted material); *see* Doc. 24 at 10, 16, 17 n.5, 19 (citations to the prior rules).) The Court addresses this threshold legal question *sua sponte* because, as will be discussed, the ALJ's decision fails to make clear which rules she applied.

> pending court claims to the administrative law judge (ALJ) and, in the remand order, instruct the ALJ to consolidate the pending court claims with the subsequent applications and adjudicate them under the prior rules.

*Id.* The instruction thus addresses precisely what should happen in a case such as Ms. Silva's, clearly directing that the prior rules apply.

In its Order Remanding Case to Administrative Law Judge following this Court's second remand, the Appeals Council directed the ALJ to "consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims[.]" (AR 1072-73.) It expressly directed the ALJ to "further evaluate the examining and non-examining source opinions in accordance with the provisions of 20 CFR 404.1527 and 416.927," i.e., under the prior rules, and "explain the weight given to such opinion evidence." (*Id.*) Despite this clear direction, ALJ Richter stated in her November 2018 decision that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 C.F.R. 404.1520c and 416.920c" (AR 984), i.e., under the current rules. To the extent the ALJ applied the current rules, she committed reversible legal error. However, it is not, in fact, clear whether the ALJ applied the current or prior rules. After stating that she was applying the current rules, ALJ Richter cited the prior rules numerous times to "provide guidance" in evaluating both the medical and nonmedical opinions of record. (AR 985-87.) And she stated as to Dr. Danto's opinion, "I recognize that Dr. Danto's opinions could be entitled to controlling weight, but I give them little weight" (AR 986), which suggests that she may have considered at least Dr. Danto's opinion under the prior rules.

In any case, the ALJ's failure to make clear in her decision what legal standard she applied in considering the medical-opinion evidence is itself a basis for reversal. *See Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) ("Failure to apply the correct legal standard or to provide [the reviewing] court with a sufficient basis to determine that appropriate legal principles have

been followed is grounds for reversal." (quotation marks and citation omitted)). Moreover, even assuming *arguendo* that she applied the prior rules, her decision fails to evince *proper* application of not only the prior rules but also other applicable rules regarding the consideration of evidence and assessment of a claimant's RFC. The Court explains.

### C.   The ALJ's Errors in Handling the Medical Opinions Vis-à-Vis the RFC She Assessed

#### 1.   The Medical Opinions of Record

The record contains seven medical source statements from six acceptable medical sources that relay specific findings regarding Ms. Silva's mental functional limitations. (AR 070-71, 387-89, 962-63, 1061-62, 1089-90, 1583-84, 1616-17.) The statements span six-and-a-half years with the earliest—a consultative examination ordered by Disability Determination Services—completed in May 2012 and the latest completed in November 2018. Two were completed by a treating source, Dr. Danto: one in November 2016 and another in November 2018. (AR 962-63, 1616-17.) Two were completed by consultative examiners: one by Dr. Owen in May 2012, and the other by Dr. Baum in October 2018. (AR 387-89, 1583-84.) Three were completed by non-examining State agency consultants: the first by Dr. Walker in May 2012 (AR 070-71); the second by Meagan Parmley, Ph.D., in February 2018 (AR 1061-62); the third by Lisa Swisher, Ph.D., in July 2018 (AR 1089-90). All told, the statements convey more than 130 separate findings regarding Ms. Silva's degree of functional limitation in the twenty specific activities used to assess the effects of a claimant's severe mental impairments on her ability to do work-related activities.

No two statements are identical—not even the two completed by Dr. Danto—and they vary significantly in both the number and degree of limitations they assess. Dr. Swisher's July 2018 statement contained the fewest limitations. She found Ms. Silva *moderately* limited in six of the twenty activities assessed and *markedly* limited in only one. (AR 1089-90.) At the other end of the

11

spectrum, in October 2018 Dr. Baum assessed limitations in all twenty activities, finding that Ms. Silva has *marked* limitations in seventeen activities and *moderate* limitations in the other three. (AR 1583-84.)

Although they differed in opinion as to whether Ms. Silva's limitation was *moderate* or *marked*, all seven statements reflect an agreement that Ms. Silva is limited in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) interact appropriately with the general public; and (7) accept instructions and respond appropriately to criticism from supervisors. Additionally, five of the six sources found that Ms. Silva is either *moderately* or *markedly* limited in her ability to respond appropriately to changes in the work setting, and four of the six sources found that Ms. Silva has either a *moderate* or *marked* limitation in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

The question, then, is whether the ALJ's RFC assessment adequately accounted for these limitations, particularly those found by all six medical sources. If not, the next question is, did the ALJ adequately explain her reasons for not incorporating certain limitations in her RFC? Before turning to a review and discussion of the ALJ's decision, though, the Court finds it will be helpful to review the general rules applicable to assessment of a claimant's RFC. Doing so provides important context for the Court's ensuing analysis.

### 2.  The Law Regarding RFC Assessment

A claimant's RFC represents "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessed should reflect the

claimant's "ability to meet the physical, mental, sensory, and other requirements of work" and must be "based on all the relevant evidence in [the claimant's] record[,]" i.e., both medical and nonmedical evidence. 20 C.F.R. §§ 404.1545(a)(1)-(4), 416.945(a)(1)-(4). "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" SSR 96-8p, 1996 WL 374184, at *7. "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 20120.) However, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

"[I]t is well settled that administrative agencies must give reasons for their decisions." *Reyes*, 845 F.2d at 244. Thus, "[t]he RFC assessment must include a narrative discussion *describing* how the evidence supports each conclusion, citing *specific* medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (emphases added). Conclusory and generic findings regarding what the evidence shows, as well as findings that fail to reflect consideration of evidence that undercuts those findings, are insufficient to support a decision. *See Barnett v. Apfel*, 321 F.3d 687, 689 (10th Cir. 2000) ("The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence."); *Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the

evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

### 3.  The ALJ's Decision

The ALJ found that Ms. Silva has the following severe mental impairments[6]: borderline intellectual functioning, major depression, anxiety, post-traumatic stress disorder ("PTSD"), attention deficit disorder, and opiate dependence. (AR 977.) Finding that none of Ms. Silva's severe impairments, alone or in combination, meets or medically equals the severity of a Listing, the ALJ proceeded to assess Ms. Silva's RFC. (AR 980-88.)

In relevant part, ALJ Richter found that Ms. Silva retains the RFC to (1) perform simple, routine, and repetitive work; (2) have occasional interaction with supervisors and coworkers and no interaction with the general public; (3) hear, understand, and communicate simple information; and (4) make simple work-related decisions in a workplace with few changes in routine work setting. (AR 983.) She further found that Ms. Silva "cannot perform assembly line production work or work in tandem with other employees." (AR 983.)

Regarding how she considered the medical opinions vis-à-vis the RFC she assessed, the ALJ explained that she accorded each the following respective weight for the following reasons[7]:

> **Dr. Meagan Parmley:** The ALJ assigned Dr. Parmley's February 2018 non-examining-source opinion "great weight" because "[h]er opinion reflects a review of and consistency with the medical evidence of record noting a number of mental status examinations within normal limits and medical records demonstrating that while the claimant has limitations, she is generally functional when compliant with treatment." (AR 985.)

---

[6] The ALJ found that Ms. Silva has a number of severe physical impairments as well (AR 977); however, because Ms. Silva does not challenge any of the ALJ's findings regarding her physical impairments, the Court does not address them.

[7] Although the Court does not reproduce the ALJ's explanations verbatim, the following summaries are substantively complete, meaning that the Court has not omitted any reason or substantive aspect of any explanation the ALJ provided for the weight she accorded each opinion.

**Dr. Lisa Swisher:** The ALJ found Dr. Swisher's July 2018 non-examining-source opinion "more persuasive" than those of Dr. Walker and Dr. Owen, but not as persuasive as Dr. Parmley's. The ALJ's decision includes no further discussion of and provides no explanation of the weight she accorded Dr. Swisher's opinion. (AR 985.)

**Dr. Scott Walker:** The ALJ gave Dr. Walker's May 2012 non-examining-source opinion "significant weight because it appears consistent with the examination findings of Dr. Owen" and "is also consistent with the claimant's ability to care for pets, shop and drive." However, the ALJ did not give Dr. Walker's opinion "more weight" because she found that the record did not support Dr. Walker's conclusion that Ms. Silva experienced repeated episodes of decompensation. (AR 985.)

**Dr. John Owen:** The ALJ gave Dr. Owen's May 2012 examining-source opinions "significant weight" because she found that they are "generally supported by objective findings" and "consistent with treatment notes demonstrating that the claimant has reported that she was doing well with treatment . . . ; was frequently assessed with normal mental status examinations . . . ; and was able to perform as a cashier, a job which, according to her, she left due to physical and not mental limitations." (AR 986.)

**Dr. Steven Baum:** The ALJ gave Dr. Baum's October 2018 examining-source opinions "little weight" because "they are not consistent with medical records and mental health treatment records indicating [Ms. Silva's] psychiatric symptoms have been reasonably controlled with normal mental status examinations and high GAF ratings[.]" (AR 987.) The ALJ specifically found that Dr. Baum's "opinions are inconsistent with the claimant's own assessment that she can manage her finances and is good at math and inconsistent with her ability to perform cashier work." (AR 987.) She also explained that she was discounting Dr. Baum's opinions based on the fact that Dr. Baum "appears to base his opinions, at least in part, on the allegation that [Ms. Silva] was living with her grandmother" because both Ms. Silva and Ms. Pedroncelli testified that Ms. Silva does not reside with Ms. Pedroncelli. (AR 987.)

**Dr. Susan Danto:** Without distinguishing between or separately discussing Dr. Danto's nonidentical November 2016 and November 2018 medical sources statements, the ALJ gave Dr. Danto's treating-source opinions "little weight" because she found them to be "inconsistent  with mental health treatment records and unsupported by Dr. Danto's own treatment notes . . ., mental status examinations, the consultative psychological evaluation, and other evidence of record." (AR 986-87.) She cited two pieces of evidence to support this finding: (1) Dr. Danto's treatment record from May 25, 2017, which according to the ALJ showed that Dr. Danto "assigned" Ms. Silva's GAF rating of 70; and (2) Dr. Danto's treatment record from October 22, 2018, which the ALJ described as showing that Ms. Silva "had normal appearance, orientation, mood, affect, speech, and thought processes." (AR 987.)

(AR 985-87.)

###### a. The ALJ Accounted for Some, But Not All, Of the Limitations Found by the Medical Sources in the RFC She Assessed

The ALJ's RFC assessment indeed incorporates and accounts for many of the unanimous medical opinions regarding Ms. Silva's functional limitations. The ALJ's assessment that Ms. Silva is able to hear, understand, and communicate only simple information—coupled with her limitation of Ms. Silva to simple, routine, and repetitive work where she can make only simple work-related decisions—accounts for the *moderate* and *marked* limitations found by the medical sources in Ms. Silva's ability to understand and remember detailed instructions and carry out detailed instructions. The ALJ's limitation of Ms. Silva to "no interaction with the general public" accounts for the uncontroverted medical opinions that Ms. Silva has either a *moderate* or *marked* limitation in her ability to interact appropriately with the general public. And her limitation of Ms. Silva to only occasional interaction with supervisors at least arguably accounts for the medical sources' respective findings that Ms. Silva is either *moderately* or *markedly*[8] limited in her ability to accept instructions and respond appropriately to criticism from supervisors.[9]

---

[8] Only Dr. Baum assessed a *marked* limitation in this area. All other medical opinions indicated that Ms. Silva has a *moderate* limitation in her ability to accept instructions and respond appropriately to criticism from supervisors.

[9] The Court notes, however, that unless the connection between the medical source's finding regarding the degree and nature of functional limitation and the limitation assessed in the RFC "is obvious," the adjudicator "must ordinarily explain how a work-related limitation accounts for mental limitations reflected in a medical opinion. *Parker v. Comm'r, SSA*, 772 F. App'x 613, 616 (10th Cir. 2019) (unpublished). The ALJ's decision does not identify what evidence supports her conclusion that Ms. Silva is able to have "occasional" interaction with supervisors on a sustained basis, i.e., up to two-and-a-half hours of interaction with supervisors per day, five days a week. *See* SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) (explaining that in the context of nonexertional limitations, "occasionally" means an individual can perform the activity "from very little up to one-third of the time"—i.e., up to approximately two-and-a-half hours per day); SSR 96-8p, 1996 WL 374184, at *7 ("In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]").

The ALJ's RFC assessment additionally incorporates other limitations found in most of the medical opinions. The ALJ's limitation of Ms. Silva to few changes in routine work setting is consistent with and accounts for the findings of five of the six medical sources that Ms. Silva is either *moderately* or *markedly* limited in her ability to respond appropriately to changes in the work setting.[10] And the ALJ's limitation of Ms. Silva to only occasional interaction with coworkers accounts for the opinions of the four medical sources that found that Ms. Silva has either a *moderate* or *marked* limitation in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[11,12]

However, the ALJ's RFC assessment omits Ms. Silva's limitations in the areas of (1) maintaining attention and concentration for extended periods, (2) performing activities within a regular schedule, maintaining regular attendance, and being punctual within customary tolerances, and (3) sustaining an ordinary routine without special supervision. In each of these areas—considered distinct, basic mental abilities needed for any job[13]—the medical sources all found that Ms. Silva has either a *moderate* or *marked* limitation.[14] By assessing no limitation at all in these

---

[10] Only Dr. Swisher found that Ms. Silva was not significantly limited in this area of functioning.

[11] Only Drs. Parmley and Swisher found that Ms. Silva had no limitation in this area.

[12] Notably, the ALJ's inclusion of these limitations is more consistent with the opinions to which she gave less, even little, weight and, in fact, is inconsistent with the two opinions to which she accorded the most weight, those being Drs. Parmley's and Swisher's, something the ALJ neither acknowledged nor explained.

[13] *See* Social Security Program Operations Manual Systems ("POMS") § DI 25020.010.B.2.a.

[14] The Court acknowledges that despite indicating in their Section I findings that Ms. Silva has a *moderate* limitation in her ability to maintain attention and concentration for extended periods, both Dr. Walker and Dr. Parmley stated in their Section III narratives that Ms. Silva can "attend and concentrate for two hours at a time[.]" (AR 070, 072, 1061, 1063.) The Commissioner appears to argue that the ALJ could properly rely on Drs. Walker and Parmley's Section III findings as a basis for assessing no limitation in Ms. Silva's ability to attend and concentrate. (Doc. 24 at 13-14.) To the extent the ALJ did so, her failure to explain that she was doing so prevents this Court from being able to rely on the Commissioner's post-hoc rationalization for the ALJ's omission of an attention/concentration limitation. *See Haga v. Astrue*, 482 F.3d 1205, 1207-8 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"). Moreover, even assuming *arguendo* that the ALJ relied on the Section III findings, her failure to provide evidence-based reasons for doing so constitutes reversible error, particularly given that neither Dr. Walker nor Dr. Parmley

areas, the ALJ effectively rejected the uncontroverted expert opinions and found that Ms. Silva has the capacity to maintain attention for two hours at a time for eight hours a day, maintain regular attendance and be punctual within strict tolerances five days a week, and sustain an ordinary routine without special supervision for eight hours a day, five days a week.[15] As discussed next, the ALJ's decision inadequately explains why she included no limitations in these areas.

### b. The ALJ Failed to Adequately Explain Her Omission of Certain Limitations Unanimously Found by the Medical Sources

The ALJ's decision does not expressly address either her implicit findings that Ms. Silva has no functional limitations in the aforementioned areas or whether and how the medical opinions support or contradict those findings. She offered a single, generic statement of how cherrypicked pieces of evidence support the RFC she assessed without demonstrating that she considered all the relevant evidence or explaining how the evidence on the whole—with citation to specific evidence—supports each of her RFC findings, whether made explicitly or implicitly. And her discussions of the medical opinions—both those she relied upon and those she rejected—rest on nothing more than generic, conclusory, and/or unsupported findings regarding the supportability and consistency of each opinion with the evidence of record. Far from providing logical and well-reasoned explanations demonstrating that she properly considered all the relevant evidence of

---

offered an explanation or cited evidence to support their conclusory findings. Furthermore, Drs. Walker and Parmley's statements that Ms. Silva can "attend and concentrate for two hours at a time" does not account for their separate Section I findings (which are unaccounted for in their respective Section III narratives) that Ms. Silva has a *moderate* limitation in her ability to (1) maintain regular attendance and be punctual within strict tolerances, and (2) sustain an ordinary routine without special supervision, which are distinct basic mental demands required in unskilled work. *See* POMS § DI 25020.010.B.3.

[15] *See* POMS § DI 25020.010.B.3 (providing that the mental abilities critical for performing unskilled work include the ability to "maintain attention for periods of 2-hour segments (concentration is not critical)" and "maintain regular attendance and be punctual within customary tolerances" where the "tolerances are usually strict[]").

18

record in assessing Ms. Silva's RFC, the ALJ's decision fails at every turn to satisfy the Court that she complied with the applicable legal standards.

For instance, in explaining her conclusion that Ms. Silva "has the mental functional ability to perform at least unskilled job tasks with limited social interactions" and, by implication, no other limitations, the ALJ reasoned, "Despite her combined impairments and symptoms, the claimant has been able to care for her own personal needs, drive a car, go to the store, go out to eat with her grandmother, live independently with her boyfriend, sweep, mop, vacuum, cook, wash dishes, shop for groceries, and watch television[.]" (AR 985.) There are at least four problems with the ALJ's one-sentence explanation regarding what Ms. Silva's activities of daily living show about her RFC to do work on a sustained basis: (1) certain of the findings regarding Ms. Silva's activities on which her explanation rests—e.g., that Ms. Silva can "care for her own personal needs" and "live independently"—mischaracterize the record and are not supported by substantial evidence[16]; (2) other findings fail to accurately reflect what the evidence shows regarding how Ms. Silva actually performs the cited activities[17]; (3) it fails to evince consideration of and explain why

---

[16] In 2012 and 2017, both Ms. Silva and Ms. Pedroncelli reported that Ms. Silva needs to be reminded and prompted to take care of her personal needs and grooming, take her medications, go to doctor's appointments, and tend to household chores. (AR 235-36, 244-45, 1230, 1232.) They also reported that Ms. Silva requires assistance with daily personal care such as dressing and caring for her hair. (AR 235, 244, 1229, 1237.) At the administrative hearing before ALJ Richter, Ms. Silva testified that her grandmother helps her get dressed and make dinner on a daily basis, reminds her to take her medications, reads things for her, helps her with money, and makes decisions for her at the grocery store. (AR 1011-14, 1022.) Ms. Pedroncelli explained that she sees Ms. Silva, who lives only three blocks away, "every day" and spends from 12:30-6:00 p.m. with Ms. Silva most days while Ms. Silva's boyfriend is at work. (AR 1037.) The Court found—and the ALJ identified—no evidence to controvert this evidence, all of which tends to prove Ms. Silva's *in*ability to take care of her personal needs and live independently.

[17] As just one example, to the extent Ms. Silva's purported ability to "watch television" supports the ALJ's conclusion that she has no limitations in her ability to attend and concentrate for extended periods, Ms. Silva's hearing testimony directly calls into question the supportability of that conclusion. Ms. Silva testified that when she watches television, she "can sit there a little bit and then I get like anxious where I have to move and then I go do something else that I was doing before." (AR 1014.) She further testified that her grandmother "gets very frustrated" with her when they try to watch movies together because she is "constantly getting up" during it. (AR 1032.) The ALJ's decision fails to evince consideration of this evidence, which calls into question the probative value of the evidence that Ms. Silva watches television. *See Krauser v. Astrue*, 638 F.3d 1324, 1332-33 (10th Cir. 2011) (explaining that to determine the probative value of evidence regarding a claimant's activities, "it is necessary to look at the actual activities [the claimant] was talking about" because "the specific facts behind the generalities [may] paint a very different picture.");

19

the ALJ chose not to rely on significantly probative evidence—particularly objective medical evidence—that tends to undercut her findings[18]; and (4) it fails to logically connect the evidence cited to the conclusion the ALJ reached regarding Ms. Silva's RFC. The ALJ offered not a single statement to explain the significance of the evidence regarding Ms. Silva's activities of daily living vis-à-vis either the RFC she assessed or the other evidence of record, particularly the medical evidence. In short, the ALJ's conclusory statement that evidence regarding Ms. Silva's activities of daily living support the RFC she assessed is plainly inadequate to support her omission from Ms. Silva's RFC of the unaccounted-for sustained concentration and persistence limitations found by the medical sources.

Regarding the ALJ's explanations of the weight she accorded Dr. Danto's and Dr. Baum's opinions, they are not only equally conclusory and undeveloped but also rest on incorrect, incomplete, and decontextualized findings as to what the evidence shows. For example, in support of her conclusion that Dr. Danto's opinions are "inconsistent with mental health treatment records" and "unsupported" by other evidence, the ALJ pointed to Dr. Danto's purported assignment of a Global Assessment of Functioning ("GAF")[19] rating of 70 to Ms. Silva in May 2017. A GAF of 70 is considered indicative of only "[s]ome mild symptoms (e.g., depressed mood and mild

---

*Sisco*, 10 F.3d at 743 (explaining that it is not proper for an ALJ to "build [a] factual basis" for her findings by taking the claimant's testimony regarding his or her daily activities "out of context and selectively acknowledging parts of [the claimant's] statements while leaving important segments out").

[18] For example, in 2012 Dr. Owen noted that Ms. Silva arrived thirty-five minutes late to her appointment and that she "had difficulty with recall, *attention* and calculation" during administration of the Mini-Mental State Examination. (AR 388 (emphasis added).) In 2018, Dr. Baum documented that Ms. Silva was unable to spell a five-letter word backwards or perform serial 7s past one place. (AR 1591.) He diagnosed her with, *inter alia*, cognitive impairments/attention deficit disorder and ADHD. (*Id.*) Additionally, both Ms. Silva and Ms. Pedroncelli consistently indicated that Ms. Silva has had lifelong challenges with maintaining attention and needs constant reminders and at least near-constant supervision. (*See* AR 221, 239, 248, 1014, 1033, 1233, 1241.)

[19] The Global Assessment of Functioning ("GAF") is a "100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005). Arguably, assigning a person a GAF of 70 could be inconsistent with an opinion that the person has *moderate* and *marked* limitations in numerous areas of functioning. However, there are numerous problems with the ALJ's reliance on this piece of evidence to support her dismissal of Dr. Danto's opinions.

The first and most obvious one is that the record the ALJ cited—Dr. Danto's treatment record from May 25, 2017—indicates that Dr. Danto assessed Ms. Silva as having a GAF score of "60" on that date, not 70. (AR 1370.) Indeed, Dr. Danto consistently assessed Ms. Silva as having a GAF score of 60 (AR 1365, 1369, 1370, 1375, 1377, 1379, 1510) and occasionally assessed a lower GAF score of 55 or 50. (AR 1368, 1371, 1373.) A GAF score of 51-60 is assessed when the patient is thought to have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* And a GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* Importantly, the GAF assesses an overall level of functioning as of a particular point in time and encompasses psychological, social, *and* occupational functioning, not just occupational functioning. *See Keyes-Zachary*, 695 F.3d at 1162 n.1 (10th Cir. 2012). While ALJs may certainly take GAF scores into consideration in both assessing a claimant's RFC and determining how consistent a medical source's opinions regarding a claimant's functional limitations are with the record as a whole, the ALJ's reliance on such evidence in this case fails to

supply a legitimate reason for discounting Dr. Danto's opinions. The ALJ not only misstated and incompletely described what the evidence shows regarding the GAF scores Dr. Danto assigned but also, and critically, failed to explain how a single GAF score—standing alone—serves as a blanket reason for rejecting Ms. Silva's treating psychiatrist's opinions regarding her limitations in specific areas of functioning.

The other reason the ALJ gave to support discounting Dr. Danto's opinions—that "[i]n October 2018, the claimant had normal appearance, orientation, mood, affect, speech, and thought processes"—is inadequate both formally and substantively. Formally, the ALJ may not pick through the evidence, citing evidence that supports her decision and ignoring evidence that detracts from it. In the same treatment record cited by the ALJ, Dr. Danto noted that Ms. Silva reported experiencing "intense nightmares," was positive for "intrusive thoughts" and "hypervigilance," and continued to be treated with prescription medications to manage her various diagnosed mental conditions. (AR 1599.) Additionally, just one month before in September 2018, Dr. Danto documented Ms. Silva's mood and affect as "anxious," i.e., not "normal." (AR 1601.) And in August 2018, although Dr. Danto indicated Ms. Silva's affect was "appropriate," she documented Ms. Silva's mood as "anxious" and increased her antidepressant dosage. (AR 1604.) The ALJ's decision reflects no consideration of any of this significantly probative evidence. Substantively, the fact that Dr. Danto recorded generally unremarkable findings upon mental status examination on one occasion does not necessarily render her opinions that Ms. Silva has *moderate* and *marked* limitations in particular areas of functioning inconsistent with and/or unsupported by the record. The ALJ provided no explanation whatsoever connecting the evidence she cited to her conclusion that Dr. Danto's opinions should be relegated for lack of support and inconsistency with the other substantial evidence of record.

The ALJ's reasons for discounting Dr. Baum's opinions are similarly inadequate. First, for the same reasons already discussed, the ALJ's generic and conclusory finding that Dr. Baum's opinions "are not consistent with medical records and mental health treatment records indicating [Ms. Silva's] psychiatric symptoms have been reasonably controlled with normal mental status examinations and high GAF ratings" is both legally inadequate and unsupported by substantial evidence. Second, the Court fails to see—and the ALJ failed to explain—how evidence that Ms. Silva indicated that she "can manage her own finances and is good at math" and that she worked as a cashier nearly a decade ago supports the ALJ's wholesale rejection of Dr. Baum's opinions. At most, this evidence perhaps suggests an inconsistency with Dr. Baum's opinion that Ms. Silva would be unable to manage benefits in her own best interest (AR 1593), but it fails to explain the ALJ's rejection of Dr. Baum's specific findings regarding Ms. Silva's work-related functional limitations. Finally, the Court agrees with Ms. Silva that the only other reason the ALJ gave for discounting Dr. Baum's opinions—that he "appears to base his opinions, at least in part, on the allegation[20] that she was living with her grandmother who was her caretaker" where the record clearly shows that Ms. Silva lives with her boyfriend, not Ms. Pedroncelli—fails to adequately explain her relegation of his findings. While true that Dr. Baum incorrectly stated in his report that Ms. Silva "reside[s] with her maternal grandmother" (AR 1591), that misstatement is not a basis to call into question the findings Dr. Baum rendered, particularly not on the record in this case. The uncontroverted evidence establishes that Ms. Pedroncelli lives three blocks away from Ms. Silva, spends an average of six hours a day with her, assists her with dressing, cooking, reading,

---

[20] The ALJ's use of the term "allegation" is noteworthy because, particularly when considered vis-à-vis the ALJ's dismissal of Dr. Baum's opinions, it suggests that the ALJ believed that Dr. Baum was actively misinformed about Ms. Silva's and Ms. Pedroncelli's living arrangements. Not only does the record not support such a conclusion but also the Court finds it more reasonable to read Dr. Baum's statement that Ms. Silva was "residing with" Ms. Pedroncelli as an inaccurate, imprecise description rather than a restatement of false information that was conveyed to him.

handling money, and grocery shopping, and has to remind her to take her medications and attend appointments. Through other statements he made in his report, Dr. Baum not only conveyed his understanding of the undisputed caretaking relationship between Ms. Pedroncelli and Ms. Silva but also explained how the nature of that relationship informed his findings. And to the extent there is even arguably probative significance to the fact that Dr. Baum may have misunderstood (or been misinformed about) Ms. Silva's living situation, the ALJ's failure to do anything more than point out Dr. Baum's misstatement leaves the Court unable to follow her reasoning for using that misstatement as a basis for rejecting Dr. Baum's opinions.

In short, then, the ALJ's decision suffers from myriad deficiencies, many of them providing independent bases for reversal, and the totality of which the Court finds troubling. As the Court noted at the outset, this is the third appeal in this case, which has now been pending for nearly a decade. The errors raised in this third appeal are not dissimilar from those that formed the bases of both of Ms. Silva's prior appeals. Because the Commissioner's final decision fails to evince application of the correct legal standards for evaluating the evidence and/or is not supported by substantial evidence in the record, reversal is proper and remand for further proceedings necessary.

### D.  Ms. Silva's Other Claim of Error

Because the Court concludes that remand is required for the reasons set forth above, the Court does not address Ms. Silva's argument that the ALJ additionally erred by utilizing a vocational conclusion when questioning VE Provine. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand").

### IV. <u>Conclusion</u>

For the reasons stated above, the Court recommends that Ms. Silva's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 20) be **GRANTED.**

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

**KIRTAN KHALSA**
**United States Magistrate Judge**